J. BRUCE ALVERSON, ESQ.
Nevada Bar No. 1339
KARIE N. WILSON, ESQ.
Nevada Bar No. 7957
**ALVERSON TAYLOR & SANDERS**
6605 Grand Montecito Pkwy, Ste. 200
Las Vegas, NV 89149
702-384-7000 Phone
702-385-7000 Fax
Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

T. MATTHEW PHILLIPS,

Plaintiff,

v.

NUTRANEXT, LLC;
NUTRANEXT DIRECT, LLC;
NATURAL VITALITY;
CLOROX SERVICES COMPANY
NATURE'S PRODUCTS, INC.;
NUTRANEXT BUSINESS, LLC
VITAMIN COTTAGE NATURAL FOOD
MARKETS, INC. and DOES 1-10 inclusive,

Defendants.

CASE NO:

**DEFENDANTS NUTRANEXT DIRECT, LLC AND VITAMIN COTTAGE NATURAL FOOD MARKETS, INC.'S NOTICE OF REMOVAL**

TO:   DEBRA KEMPI, Clerk, United States District Court for the District of Nevada

PLEASE TAKE NOTICE that Defendants NUTRANEXT DIRECT, LLC and VITAMIN

COTTAGE NATURAL FOOD MARKETS, INC. hereby remove to this Court the state court

action entitled "T. MATTHEW PHILLIPS, Plaintiff v. NUTRANEXT, LLC, NUTRANEXT

DIRECT, LLC, NATURAL VITALITY, CLOROX SERVICES COMPANY, NATURE'S

1

KNW 26554

PRODUCTS, INC., NUTRANEXT BUSINESS, LLC, and VITAMIN COTTAGE NATURAL FOOD MARKETS, INC., Defendants," Case No. A-20-808776-C filed in the Eighth Judicial District Court for the State of Nevada, County of Clark.  A copy of the Complaint is attached hereto as Exhibit A.  The grounds for removal are:

1.      This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. §§ 1441(a)-(c), in that it is a civil action between Plaintiff, a citizen of Nevada, and Defendants who are citizens of diverse residency, none of which reside in Nevada, with the exception of Defendant NUTRANEXT DIRECT, LLC, which was improperly named as a Defendant. The matter in controversy exceeds $75,000.00, exclusive of interest and costs.

2.      Based upon information and belief, Plaintiff T. MATTHEW PHILLIPS is a citizen of Clark County, Nevada, as indicated in the Complaint. *See* Complaint ¶ 1.

3.      Defendant NUTRANEXT, LLC is a corporation incorporated in Delaware, with its principal place of business in Sunrise, Florida.

4.      NUTRANEXT DIRECT, LLC is a corporation incorporated in Nevada; however, this Defendant was improperly named and did not manufacture, distribute, or sell the product at issue in Plaintiff's Complaint. Defendants have filed a Motion to Dismiss concurrently with this Removal to correct the named Defendants.

5.      NATURAL VITALITY is a product name and is not a corporation with any residency.

6.      CLOROX SERVICES COMPANY is a corporation incorporated in Delaware, with its principal place of business in Oakland, California.

7.      NATURE'S PRODUCTS, INC. is a corporation incorporated in Florida, with its principal place of business in Sunrise, Florida.

ALVERSON TAYLOR & SANDERS
LAWYERS
6605 GRAND MONTECITO PKWY STE 200
LAS VEGAS, NV 89149
(702) 384-7000

KNW 26554

ALVERSON TAYLOR & SANDERS
LAWYERS
6605 GRAND MONTECITO PKWY STE 200
LAS VEGAS, NV 89149
(702) 384-7000

8.     VITAMIN COTTAGE NATURAL FOOD MARKETS, INC. is a corporation incorporated in Colorado, with its principal place of business in Lakewood, Colorado.

9.     The Defendants sued as DOES I through X, inclusive and ROE CORPORATIONS I through X, inclusive, are fictitious parties and not relevant to the determination of subject matter jurisdiction. *See* 28 U.S.C. § 1441(a) (stating "For purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded").

10.     Upon information and belief, the amount in controversy, exclusive of interest and costs, exceeds $75,000.00. In his Complaint, Plaintiff alleged numerous claims including deceptive trade practices, defective product, breach of implied warranty of fitness, battery, and emotional distress (negligent and intentional). *See* Complaint ¶ 41-91. Plaintiff specifically alleged that "red particles" in the subject product were "nanosensors" which were "smart" technology devices. *See* Complaint ¶ 27. Plaintiff has stressed over the "nanosensors" to the point that he developed a "fear that he may develop cancer." *See* Complaint ¶ 32. He also believes that ingesting the subject product caused him "pain kidney problems and overactive bladder issues." *See* Complaint ¶ 33. Further, Plaintiff alleged numerous damages including general, special, punitive and exemplary damages, and injunctive relief. *See* Complaint ¶ 92.

11.     Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1441(a) and 1446(a)-(b) and Local Rule 8-1. This action was originally brought in the Eighth Judicial District for Clark County, State of Nevada.

12.     This notice of removal is timely filed within thirty (30) days after receipt of the paper that makes this case removable as required by 28 U.S.C. § 1446(b), in that it is filed within thirty (30) days following the service of the Summons and Complaint. Defendant NUTRANEXT DIRECT, LLC, was served with the Complaint on January 30, 2020. Defendant VITAMIN

KNW 26554

1  COTTAGE NATURAL FOOD MARKETS, INC. was served on February 4, 2020. The other

2  named Defendants have not yet been served.

3     13.  Pursuant to 28 U.S.C. 1446(d), Defendants have prepared and will file with the

4  Clerk of the Eighth Judicial District Court a Notice of Removed Action.

5     Dated this 18th day of February, 2020.

6               ALVERSON TAYLOR & SANDERS

7

8               _____

9               J. BRUCE ALVERSON, ESQ.
             Nevada Bar No. 1339
             KARIE N. WILSON, ESQ.

10               Nevada Bar No. 7957
             6605 Grand Montecito Pkwy, Ste. 200

11               Las Vegas, NV 89149
             702-384-7000 Phone

12               702-385-7000 Fax
             Attorneys for Defendants

13

14

15

16

17

18

19

20

21

22

23

24

             4

ALVERSON TAYLOR & SANDERS
LAWYERS
6605 GRAND MONTECITO PKWY STE 200
LAS VEGAS, NV 89149
(702) 384-7000

1

## CERTIFICATE OF ELECTRONIC SERVICE

2      I certify that on the 18th day of February, 2020, service of the above and foregoing

3    **DEFENDANTS NUTRANEXT DIRECT, LLC AND VITAMIN COTTAGE NATURAL**

4    **FOOD MARKETS, INC.'S NOTICE OF REMOVAL** was made by electronically filing a

5    true and correct copy of the same to each party addressed as follows:

6    T. Matthew Phillips, Esq.
     tmatthewphillips@humanoid.net
7    4894 W. Lone Mountain Rd., No. 132
     Las Vegas, Nev. 89130
8    323-314-6996 Phone
     Plaintiff Pro Per

9



10

11   _____
     Employee of ALVERSON TAYLOR & SANDERS

12

13   n:\bruce.grp\z-client\26554\pleadings\notc removal.docx

14

15

16

17

18

19

20

21

22

23

24

**ALVERSON TAYLOR & SANDERS**
LAWYERS
6605 GRAND MONTECITO PKWY STE 200
LAS VEGAS, NV 89149
(702) 384-7000

KNW 26554

EXHIBIT A

Electronically Filed
1/17/2020 3:35 PM
Steven D. Grierson
CLERK OF THE COURT

T. Matthew Phillips, Esq.
TMatthewPhillips@humanoid.net
4894 W. Lone Mountain Rd., No. 132
Las Vegas, Nev. 89130
Tel.: (323) 314-6996

*Plaintiff in Propia Persona*

CASE NO: A-20-808776-C
Department 24

# EIGHTH JUDICIAL DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| **T. MATTHEW PHILLIPS** | Case No: |
| *Plaintiff,* | COMPLAINT FOR DAMAGES AND INJUNCTION. |
| vs. | [Plaintiff Demands Jury Trial] |
| 1. **NUTRANEXT, LLC** | |
| 2. **NUTRANEXT DIRECT, LLC** | |
| 3. **NATURAL VITALITY** | |
| 4. **CLOROX SERVICES COMPANY** | |
| 5. **NATURE'S PRODUCTS, INC.** | |
| 6. **NUTRANEXT BUSINESS, LLC** | |
| 7. **VITAMIN COTTAGE NATURAL FOOD MARKETS, INC.** | |
| and **DOES 1 – 10, inclusive,** | |
| *Defendants.* | |

1

## ❧ PARTIES *and* JURISDICTION ❧

2   (1)     Plaintiff, T. MATTHEW PHILLIPS, is a resident of Clark County, Nevada.

3   Plaintiff is also a licensed California attorney, in "good standing," for 27 years,

4   since 1993; (Plaintiff is *not* licensed in Nevada).  Plaintiff demands jury trial.

5   (2)     Plaintiff believes that the consumer product herein at-issue is manufactured,

6   advertised, and sold nationwide by at least one of the following entities:

7          I.  Defendant, NUTRANEXT, LLC, is a Florida business entity—*not* licensed

8          to do business in Nevada.  The Florida Secretary of State provides:  FEI/EIN

9          Number: 47-2303382.  Delaware.  Address: 1221 Broadway, Oakland, Calif.

10         94612; (same address as Defendant, CLOROX SERVICES COMPANY).

11         II.  Defendant, NUTRANEXT DIRECT, LLC,  is a licensed Nevada entity that

12         does business in Clark County, Nev.  The Nevada Secretary of State

13         provides:  Entity Number: E0472482014-6.  Entity Type: Domestic Limited

14         Liability Company.  Entity Status: Active.  Formation Date: 09/12/2014.

15         Business ID: NV20141583037.  Address: 1221 Broadway, Oakland, Calif.,

16         94612; (same address as Defendant, CLOROX SERVICES COMPANY).

17         III.  Defendant, NATURAL VITALITY, is a Texas business entity of unknown

18         form doing business in Clark County, Nev.  Principal place of business:

19         12200 Anderson Mill Road, Austin, Texas, 78726.  Telephone: (866) 416-

20         9216. Note: according to the product label, NATURAL VITALITY is the

21         distributor for the product herein at issue.

22         IV.  Defendant, CLOROX SERVICES COMPANY, is a licensed Nevada entity

23         that does business in Clark County, Nev.  The Nevada Secretary of State

24         provides the following:  Entity Number: E2050932019-4.  Entity Type:

25         Foreign Corporation.  Entity Status: Active.  Formation Date: 08/09/2019.

26         Business ID: NV20191591974.  Address: 1221 Broadway, Oakland, Calif.,

27         94612.  Note:  Plaintiff believes that CLOROX SERVICES COMPANY is the

28         parent company that controls all the others.

V.  Defendant, NATURE'S PRODUCTS, INC., is a Florida business entity—*not* licensed to do business in Nevada.  The Florida Secretary of State provides: FEI/EIN Number: 59-2650223.  Date Filed: 03/03/1986.  Effective Date: 02/27/1986.  State:  FL.  Address: 1221 Broadway, Oakland, Calif., 94612; (same address as Defendant, CLOROX SERVICES COMPANY).

VI.  Defendant, NUTRANEXT BUSINESS, LLC, is a Florida business entity— *not* licensed to do business in Nevada.  FEI/EIN Number: 81-1070722.  Date Filed: 03/19/2018.  State: DE.  Address: 1221 Broadway, Oakland, Calif., 94612; (same address as Defendant, CLOROX SERVICE COMPANY).

VII.  Plaintiff purchased the product at-issue from Defendant, VITAMIN COTTAGE NATURAL FOOD MARKETS, INC., a licensed Nevada entity, dba "*Natural Grocers*."  The Nevada Secretary of State provides:  Entity Number: E0441892014-8. Entity Type: Foreign Corporation. Status: Active. Formation Date: 08/25/2014.  Business ID: NV20141546627.  Principal place of business: 12612 W. Alameda Parkway, Lakewood, Colo., 80228.

(3)     Plaintiff alleges that each DOE Defendants, 1 – 10, is a proximate cause of his harm.  When Plaintiff learns their true and correct names, he will amend.

(4)     Jurisdiction is proper in Clark County, Nev. because: (i) Defendants do business in Clark County; (ii) Plaintiff resides in Clark County; and (iii) Plaintiff purchased the product at-issue in Clark County.

(5)     The product at-issue fails to identify its origin. *"Who"* manufactures it? *"Where"* is it manufactured?  Defendants won't say.  Plaintiff bought the product from, Defendant, VITAMIN COTTAGE NATURAL FOOD MARKETS, INC.  Plaintiff contacted its general counsel, John Fischer, Esq., but counsel steadfastly refuses to identify the manufacturer.  At the time of this writing, the manufacturer's secret identity remains unknown to Plaintiff.

/ / / /

/ / / /

## ❧ FACTUAL ALLEGATIONS ❧

1

2   (6)    Plaintiff, T. MATTHEW PHILLIPS, is a resident of Clark County, Nevada.

3   Plaintiff is a health food enthusiast.  Plaintiff is a consumer of dietary supplements.

4   Plaintiff maintains a clean diet.  Plaintiff eats organic.  Plaintiff regularly exercises.

5   Plaintiff takes no pharmaceutical products of any kind whatsoever.

6   (7)    Defendants advertise and sell dietary supplements in Clark County, Nevada.

7   Defendants advertise and sell a dietary supplement called ***Natural Vitality Calm***,

8   for which Plaintiff now files suit.

9   (8)    ***Natural Vitality Calm*** is a magnesium supplement.  Magnesium is essential

10   for proper muscle function; magnesium promotes a healthy heart.  Due to pesticide

11   overuse, most Americans today are magnesium deficient.

12   (9)    Magnesium tends to relax the body, which helps folks fall asleep naturally

13   without resort to sleeping pills.  Due to magnesium's "calming" effect, this must

14   explain why the word *"calm"* appears in the name—***Natural Vitality Calm.***

15   (10)    Magnesium also tends to create a laxative effect, which may help with

16   constipation; however, some folks experience loose bowels, especially when

17   consumers exceed the recommended daily allowance (RDA) for magnesium,

18   (approx. 400 miligrams per day).

19   (11)    Defendants manufacture, advertise, and sell the popular health food product,

20   ***Natural Vitality Calm,*** which is a magnesium powder; when mixed with water,

21   it creates the chemical compound "magnesium citrate," which folks consume.

22   The product is sold in plastic tubs.  The product comes in the form of a fine, dry,

23   white powder.  The powder consists chiefly of magnesium carbonate and citric

24   acid, along with sweeteners.

25   (12)    When mixed with water, the ***Natural Vitality Calm*** powder creates a

26   chemical reaction.  When it hits water, the white powder fizzes-up with carbon-

27   dioxide bubbles.  After the CO2 bubbles fizz away, the magnesium binds to the

28   citric acid to form "magnesium citrate," which folks ingest.

(13)   The ***Natural Vitality Calm*** label recommends that consumers begin with *one-half teaspoon*, (1 gram), of product mixed with 2–3 ounces of hot water; cold water works just as well, but the chemical reaction time is slower and the bubbles last longer.  The label further recommends that consumers, over time, increase their daily allowance to *two teaspoons*, (4 grams).

(14)   Plaintiff purchased a tub of the ***Natural Vitality Calm***, (cherry flavor), on Aug. 10, 2019, from Defendant, VITAMIN COTTAGE NATURAL FOOD MARKETS, INC., in Las Vegas, Nev.  Plaintiff would use this tub of magnesium powder for approx. ten weeks.  Plaintiff would regularly prepare two teaspoonfuls of product mixed into an 8-ounce water glass; and then, when the bubbles dissipated, Plaintiff would guzzle the product and finish-off the entire glass.

(15)   On Oct. 21, 2019, Plaintiff had major dental surgery which required more than a dozen sutures.  Due to the attendant pain and discomfort, Plaintiff found it difficult to drink.  Plaintiff took no painkillers.  On the evening of Oct. 21, 2019, still in pain from the surgery, Plaintiff poured an 8-ounce glass of water and mixed-in the ***Natural Vitality Calm*** product; however, Plaintiff was unable to finish the glass.  Plaintiff fell asleep.  In the early morning hours of Oct. 22, 2019, Plaintiff awoke in pain.  He got out of bed thirsty.  Plaintiff went to resume drinking the half-consumed glass of product he had poured several hours earlier; however, as he raised the glass to his lips, Plaintiff noticed the presence of "tiny red dots" floating at the bottom of the half-consumed glass.  Plaintiff was bewildered; but he was also half-asleep and in considerable pain.  He poured the glass into the sink and forgot about it.

(16)   On or about Oct. 23, 2019, Plaintiff prepared an 8-ounce glass with two teaspoonfuls of the ***Natural Vitality Calm*** product.  However, with gums still swollen, Plaintiff was again unable to drink the entire glass.  Later that day, Plaintiff went to finish the half-consumed glass; however, as he raised it, he again noticed the "tiny red dots" floating at the bottom of the glass—approx. one dozen

specks of red material, each speck smaller than a bread-crumb. This was the second time Plaintiff saw the "tiny red dots." Totally gross and disgusting. Plaintiff poured the glass down the drain.

(17)    Curiously, Plaintiff had never before noticed anything "red" in a *glassful* of the product—nor had he ever noticed anything "red" in a *spoonful* of the product, which again, is a fine "white" powder. Plaintiff was puzzled.

(18)    Based on his recent dental surgery, Plaintiff formed the belief that the "tiny red dots" must be blood particles or debris—resulting from bleeding sutures— which had apparently "backwashed" into the drinking glass as he struggled to drink liquid in the aftermath of major dental surgery.

(19)    On or about Oct. 24, 2019, the cycle repeated. Plaintiff prepared a glass of the product and waited for the bubbles to clear; however, before he took a drink, he again saw the "tiny red dots" floating at the bottom of the glass. Plaintiff was baffled; this was the third time he saw the red particulate matter.

(20)    Plaintiff began to speculate on the mystery of the "tiny red dots." Plaintiff began to doubt that they were attributable to dental suture backwash. After all, he never saw any red particles or debris in a glass of *straight* water. Plaintiff became suspicious. What are the "tiny red dots?" Cherry bits?—in a "cherry flavored" product? But if they are cherry bits, then (a) why has Plaintiff never before seen them in a *spoonful* of the product, and (b) why has Plaintiff never before seen them in a *glassful* of the product? And, if they really are cherry bits, then how come the product doesn't advertise: *"Made with Real Cherry Bits!"* on the label?

(21)    Near the end of October 2019, Plaintiff undertook an experiment with the **Natural Vitality Calm** to determine whether the "tiny red dots" originate from inside the product tub. Plaintiff poured a glassful of water and mixed-in two teaspoonfuls of the magnesium powder. After a few minutes, the $CO_2$ bubbles cleared and Plaintiff saw the conspicuous "tiny red dots." Plaintiff concluded that the "tiny red dots" originated from *inside* the product tub.

(22)    Plaintiff contacted Defendants via their 800 number to complain about contaminants in the ***Natural Vitality Calm.***  Defendants promised to call him back, but no one ever did.  Plaintiff tried to talk to the legal department, but no one ever got back.  The parties exchanged a few pointless emails.

(23)    Plaintiff again performed the experiment.  After achieving the same results, ("tiny red dots"), Plaintiff, on or about Nov. 6, 2019, photographed the test remnants floating in the water glass.  The photographs depict tiny red particles as well as a peculiar gelatinous substance that seemingly binds the dots together.  Plaintiff decided to preserve the evidence; he took the contaminated glass and set it atop the refrigerator—where it remained undisturbed.

(24)    Plaintiff wondered whether the "tiny red dots" might be present in other tubs of the product.  Plaintiff happened to have, in his pantry, another tub of the product, which he tested; however, this tub yielded no contaminants.

(25)    On Nov. 6, 2019, Plaintiff visited Defendant, VITAMIN COTTAGE NATURAL FOOD MARKETS, INC., (where he purchased the tainted tub back on Aug. 10, 2019).  Plaintiff searched for the same lot number as the contaminated lot, but he was unable to find a match.  Plaintiff purchased two more tubs for testing.  With these new tubs, Plaintiff tested to see whether the "tiny red dots" would appear; but these tub samples yielded no contaminants.  Plaintiff thus concluded that the "tiny red dots" were unique to the tub he purchased back on Aug. 10, 2019, from Defendant, VITAMIN COTTAGE NATURAL FOOD MARKETS, INC.

(26)    Plaintiff repeated the experiments for employees of Defendant, VITAMIN COTTAGE NATURAL FOOD MARKETS, INC.  Plaintiff asked employees to open a new tub of the product, in-store, to see whether "tiny red dots" would appear when mixed with water.  A tub was sampled in-store; however, this tub sample yielded no contaminants.  But when Plaintiff used product powder from the tainted tub, (purchased back on Aug. 10, 2019), store employees saw the "tiny red dots."  [*See* attached photos.]

(27)   About this time, Plaintiff re-examined the test sample that he placed on the fridge several days earlier; upon re-examination, Plaintiff was astonished at what he saw—the "tiny red dots" had become buoyant—and had risen from the bottom of the glass—and were now floating higher-up near the water line.  The gelatinous substance appeared to more tightly bind the particles.  Plaintiff was amazed at the transformation.  The "tiny red dots" now appeared to be intentionally huddled-up together, enmeshed with the gelatinous substance up at the water line, instead of randomly dispersed at the bottom of the glass.  [*See* attached photos.]

(28)   Remarkable though it may sound, Plaintiff believes the red particles may be self-assembling "nanosensors," *i.e.*, tiny "smart" technology devices.  The magnesium powder may contain microscopic particles that, upon contact with water, expand, turn red, congregate together, and then morph into "nanosensors," which have the ability to send and receive EMF signals.

(29)   Nanosensor technology exists; nanosensors are added to food products to monitor bacterial and fungal growth.  Consumers sometimes eat the nanosensors without knowing it.  Long-term health effects are unknown.

(30)   Nanosensors are also used for remote medical testing and remote patient monitoring.  Nanosensors are capable of sending and receiving EMF signals with data concerning a person's "vital signs," including pulse rate, heart rate, blood pressure, blood type, temperature, glucose levels, insulin levels, hormone levels, drug interactions, metabolic activity, brain activity, *etc*.  The U.S. Patent Office awards patents for such technologies, which can be used to conduct remote medical experiments—on random test subjects—for research into cutting-edge gene therapies, chemotherapies and novel pharmaceutical drugs.

(31)   Plaintiff speculates that Defendants may plant nanosensors in the product—for food safety and/or medical research; yes, Plaintiff may be a *conspiracy theorist*, wildly speculating on the nature and purpose of the tiny red particles—but that's only because Defendants refuse to be forthcoming in the first place.

(32)   Plaintiff is informed that nanosensors contain carcinogenic chemicals and that nanosensors create carcinogenic EMF fields.  As a direct result of having ingested the tiny red particles for approx. ten (10) weeks, Plaintiff has developed a genuine (and not unreasonable) fear that he may develop cancer.

(33)   During the ten (10) weeks that Plaintiff ingested the tainted magnesium powder, he experienced painful kidney problems and overactive bladder issues. Because of the closeness in time, Plaintiff attributes his kidney and bladder ailments to ingestion of the red particulate matter.  (These painful kidney and bladder ailments may be related to passing the red particles; at the time of this writing, these ailments have largely abated.)

(34)   Plaintiff does not know the true nature or purpose of the tiny red particles. Are they legitimate food additives?  Stabilizers?  Preservatives?  Perhaps Defendants make other products that contain red particulate matter, which accidentally fell-off a conveyor belt—straight into a vat of magnesium powder? Who knows?  But Plaintiff does know this—no red particles should be in the magnesium powder!  The tub purchased back on Aug. 10, 2019 contains tiny red particles that should *not* be there.  This tub is defectively labeled, for failure to mention, on the ingredient panel, that the product contains suspicious-looking, red particulate matter of unknown origin.  [*See* attached photos.]

(35)   Notably, the tubful of product purchased on Aug. 10, 2019 is the only tub to yield the red particles.  Five (5) other tubs sampled yielded no red particles.

(36)   The product fails to identify "who" manufactures the product or "where" it's manufactured.  This shows intent to deceive.  Defendants must identify the manufacturer's name and address.

(37)   By this lawsuit, Plaintiff expects that Defendants will disclose the true nature and purpose of the "tiny red dots," (including a chemical breakdown). Plaintiff also expects to establish binding precedent, *i.e.*, that all Nevadans have a fundamental right to know what's in the food they eat!

(38)   Plaintiff seeks (i) general, (ii) special, and (iii) punitive damages on the below-listed causes of action:

Claim No. I - engaging in deceptive trade practices;

Claim No. II - selling defective products;

Claim No. III - breaching the implied warranty of fitness;

Claim No. IV - causing battery (unconsented touching);

Claim No. V - inflicting emotional distress.

(39)   Plaintiff seeks preliminary and permanent injunctions:  (a) a court order requiring Defendants to identify the nature and purpose of the red particles, as well as their ingredients; (b) a court order prohibiting Defendants from selling products tainted with the red particles; (c) a court order recalling tainted lot numbers; (d) a court order requiring Defendants to identify the product manufacturer; and (e) a court order requiring Defendants to identify the red particle manufacturer.

(40)   When Defendants reveal the true nature and purpose of the red particulate matter, the Court must then determine whether it is "harmful" to human health. If the red particles are "harmful," (according to some workable definition), then it may establish grounds to allege "food poisoning."  Nevada law, at NRS § 202.170, defines "food poisoning"—

"A person who willfully mingles poison or any other harmful substance, *including, but not limited to, glass or a razor blade*, in any food, *drink or medicine* intended or prepared for the use of a human *being, and a person who willfully poisons any spring, well or reservoir of water, is guilty of a category B felony and shall be punished by imprisonment in the state prison for a minimum term of not less than 2 years and a maximum term of not more than 15 years, or by a fine of not more than $10,000, or by both fine and imprisonment.*"  [NRS § 202.170; underscores and italics added].

////
////

⚘ <u>CAUSE</u> <u>of</u> <u>ACTION</u> <u>No. 1</u> ⚘

(41)   DECEPTIVE TRADE PRACTICES:  Plaintiff brings this Cause-of-Action No. 1, for ***Deceptive Trade Practices,*** under NRS § 41.600, as against all Defendants. Plaintiff here incorporates all numbered paragraphs.

(42)   NRS § 41.600 empowers consumer fraud victims to bring lawsuits alleging deceptive trade practices.  "An action may be brought by any person who is a victim of consumer fraud," [*see* NRS § 41.600(1)].

(43)   NRS § 41.600(2)(e) provides that the term "consumer fraud" incudes, "[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive," [*see* NRS § 41.600(2)(e)].

(44)   NRS § 598.0915(5) defines "deceptive trade practice."  A person engages in a "deceptive trade practice" if, in the course of his or her business or occupation, he or she "[k]nowingly makes a false representation as to the characteristics, <u>ingredients</u>, uses, benefits, alterations or quantities of goods or services for sale or lease," [*see* NRS § 598.0915(5); underscore added].

(45)   Defendants engage in "deceptive trade practices" by knowingly making false representations as to the "<u>ingredients</u>" of goods for sale, as proscribed by NRS § 598.0915(5).

(46)   Defendants make false representations as to the ingredients in the ***Natural Vitality Calm*** product.  The label's ingredient list *does not* accurately reflect what's really in the product tub—and this is a "deceptive trade practice."  Some batches of the product contain a secret ingredient—*i.e.*, tiny red particles of unknown origin—which are *not* listed on the product label.  The un-disclosed use of un-listed ingredients in food products is a "deceptive trade practice."

(47)   NRS § 598.0923(2) further defines "deceptive trade practices."  A person engages in "deceptive trade practices" when in the course of his or her business or occupation he or she knowingly "fails to disclose a <u>material</u> <u>fact</u> in connection with the sale . . . of goods or services," [NRS § 598.0923(2); underscores added].

(48)   Defendants fail to disclose "all" ingredients in the product.  On the product label, Defendants never mention the tiny red particles.  In other words, Defendants fail to disclose every single ingredient in the product.

(49)   Stated another way, Defendants fail to disclose that the product comes with tiny red particles of unknown origin.  The existence of red particulate matter is a "material fact" because its presence, if known to the public, would affect consumer buying decisions.  If folks knew that the magnesium powder contains microscopic particles that—upon contact with water—swell in size, turn the color red, become buoyant, and enmesh together inside a sticky film—then fewer people would buy the product.

(50)   Defendants fail to disclose the identity of the "manufacturer" of the product. Curiously, Defendants disclose a *"distributor"*—an entity called NATURAL VITALITY in Austin, Tex.—but they fail to disclose the *"manufacturer," i.e.*, the entity that actually produces the magnesium powder—*i.e.*, the entity presumably responsible for lacing the powder with tiny red particles.  In addition, Defendants also fail to identify the manufacturer of the red particles—and furthermore, Defendant also fail to identify the ingredients inside the tiny red particles.

(51)   All tolled, Defendants commit five counts of "deception"—for failure to disclose the following material facts:

    (i)      Defendants fail to disclose "all" ingredients in the product;

    (ii)     Defendants fail to disclose the presence of red particles in the product;

    (iii)    Defendants fail to disclose the ingredients in the red particles;

    (iv)    Defendants fail to disclose the product manufacturer's identity; and,

    (v)     Defendants fail to disclose the red particle manufacturer's identity.

(52)   Defendants make still more false and misleading claims; they claim the product contains "*no artificial colors*."  But this is untrue!  The product contains "red" particles, when it should be "all-white."  The "*no artificial colors*" slogan is false because no "red" objects should appear in "all-white" powder.

(53)   Nevadans have a fundamental right to know what's in the food they eat! Plaintiff seeks an award of damages, costs and reasonable attorney's fees.  As per NRS § 41.600(3)(a)–(b), if the claimant is the prevailing party, "the court shall award him: (a) any damages that he has sustained; and (b) his costs in the action and reasonable attorney's fees," [*see* NRS § 41.600(3)(a)–(b)].

(54)   Plaintiff seeks preliminary and permanent injunctions:  (a) a court order requiring Defendants to identify the nature and purpose of the red particles, as well as their ingredients; (b) a court order prohibiting Defendants from selling products tainted with the red particles; (c) a court order recalling tainted lot numbers; (d) a court order requiring Defendants to identify the product manufacturer; and (e) a court order requiring Defendants to identify the red particle manufacturer.

(55)   Plaintiff seeks "punitive damages" for fraud.  Plaintiff seeks a dollar amount sufficient to deter future misconduct.  Defendants demonstrate fraud because they act with intent to deceive others—(i) Defendants fail to disclose "all" ingredients in the product, (ii) Defendants fail to disclose the presence of red particulate matter in the product, (iii) Defendants fail to disclose the ingredients in the red particulate matter, (iv) Defendants fail to disclose the product manufacturer's identity, and (v) Defendants fail to disclose the red particle manufacturer's identity.

(56)   Plaintiff seeks an award of litigation expenses, courts costs and reasonable attorney's fees—for enforcing important rights affecting the public interest.

/ / / /

/ / / /

/ / / /

1

☙ <u>CAUSE</u> <u>of</u> <u>ACTION</u> <u>No. 2</u> ❧

2

(57)   <u>STRICT LIABILITY—DEFECTIVE PRODUCT</u>:  Plaintiff brings this Cause-of-

3 Action No. 2, for ***Strict Liability—Defective Product,*** as against all Defendants.

4 Plaintiff here incorporates all numbered paragraphs.

5 (58)   Nevada law creates "strict liability" for "defective" products.  In Nevada,

6 manufacturers and sellers are strictly liable for damages caused by their defective

7 products, even in instances where the manufacturer and seller were not negligent.

8 (59)   The ***Natural Vitality Calm*** product is "defective" because some batches

9 come with a condition that defeats consumers' "reasonable" expectations—*i.e.*,

10 some batches come with mysterious, tiny red particles; this defeats the expectation

11 that food products will be free of off-label ingredients of unknown origin.

12 (60)   The ***Natural Vitality Calm*** is *per se* "defective."  If consumers were to learn

13 the actual truth about the secret ingredients lurking in the ***Natural Vitality Calm,***

14 fewer consumers would purchase it—which proves the "defect."

15 (61)   The product "defect"—*i.e.*, the fact that it's laced with tiny red particles

16 of unknown origin—existed when the product left the manufacturer—the "defect"

17 existed when manufacturer delivered the product to the grocer—and the "defect"

18 existed when the grocer placed the product on grocery store shelves.  The product

19 "defect" is the cause-in-fact of Plaintiff's harm.

20 (62)   As a result of the "defect," Plaintiff sustains injuries.  Defendants' actions

21 were a substantial factor in causing Plaintiff's harm, along with attendant pain and

22 suffering.  Plaintiff seeks monetary damages in an amount T.B.D. at trial.

23 (63)   Plaintiff seeks preliminary and permanent injunctions:  (a) a court order

24 requiring Defendants to identify the nature and purpose of the red particles, as well

25 as their ingredients; (b) a court order prohibiting Defendants from selling products

26 tainted with the red particles; (c) a court order recalling tainted lot numbers;

27 (d) a court order requiring Defendants to identify the product manufacturer; and

28 (e) a court order requiring Defendants to identify the red particle manufacturer.

☙ *Complaint for Damages and Injunction*, p. 14 ❧

(64)   Plaintiff seeks "punitive damages" for fraud.  Plaintiff seeks a dollar amount sufficient to deter future misconduct.  Defendants demonstrate fraud because they act with intent to deceive others—(i) Defendants fail to disclose "all" ingredients in the product, (ii) Defendants fail to disclose the presence of red particulate matter in the product, (iii) Defendants fail to disclose the ingredients in the red particulate matter, (iv) Defendants fail to disclose the product manufacturer's identity, and (v) Defendants fail to disclose the red particle manufacturer's identity.

(65)   Plaintiff seeks an award of litigation expenses, courts costs and reasonable attorney's fees—for enforcing important rights affecting the public interest.

/ / / /

/ / / /

/ / / /

1

❧ CAUSE of ACTION No. 3 ❧

2   (66)   BREACH OF IMPLIED WARRANTY OF FITNESS:  Plaintiff brings this Cause-of-
3   Action No. 3, for ***Breach of Implied Warranty of Fitness*,** as against all
4   Defendants.  Plaintiff here incorporates all numbered paragraphs.

5   (67)   Nevada law recognizes the "implied warranty of fitness for intended use,"
6   *i.e.*, manufacturers impliedly warrant that their products are fit for ordinary use.
7   Manufacturers and sellers are liable for damages caused by their *unfit* products,
8   even in instances where there is no negligence by manufacturer or seller.

9   (68)   The tub of product that Plaintiff purchased is "defective" because it comes
10  with a condition that defeats consumers' "reasonable" expectations—*i.e.*, that food
11  products will be free of off-label ingredients of unknown origin.

12  (69)   The tub of product is *per se* "defective."  If consumers were to learn the
13  actual truth about the secret ingredients lurking in the ***Natural Vitality Calm*,**
14  fewer consumers would purchase it—which proves the "defect."

15  (70)   The product "defect"—*i.e.*, the fact that it's laced with tiny red particles
16  of unknown origin—existed when the product left the manufacturer—the "defect"
17  existed when manufacturer delivered the product to the grocer—and the "defect"
18  existed when the grocer placed the product on grocery store shelves.  The product
19  "defect" is the cause-in-fact of Plaintiff's harm.

20  (71)   As a result of the "defect," Plaintiff sustains injuries.  Defendants' actions
21  were a substantial factor in causing Plaintiff's harm, along with attendant pain and
22  suffering.  Plaintiff seeks monetary damages in an amount T.B.D. at trial.

23  (72)   Plaintiff seeks preliminary and permanent injunctions:  (a) a court order
24  requiring Defendants to identify the nature and purpose of the red particles, as well
25  as their ingredients; (b) a court order prohibiting Defendants from selling products
26  tainted with the red particles; (c) a court order recalling tainted lot numbers;
27  (d) a court order requiring Defendants to identify the product manufacturer; and
28  (e) a court order requiring Defendants to identify the red particle manufacturer.

(73)   Plaintiff seeks "punitive damages" for fraud.  Plaintiff seeks a dollar amount sufficient to deter future misconduct.  Defendants demonstrate fraud because they act with intent to deceive others—(i) Defendants fail to disclose "all" ingredients in the product, (ii) Defendants fail to disclose the presence of red particulate matter in the product, (iii) Defendants fail to disclose the ingredients in the red particulate matter, (iv) Defendants fail to disclose the product manufacturer's identity, and (v) Defendants fail to disclose the red particle manufacturer's identity.

(74)   Plaintiff seeks an award of litigation expenses, courts costs and reasonable attorney's fees—for enforcing important rights affecting the public interest.

/ / / /

/ / / /

/ / / /

❧ <u>CAUSE</u> <u>of</u> <u>ACTION</u> <u>No. 4</u> ☙

(75)   <u>BATTERY—UNCONSENTED TOUCHING</u>:  Plaintiff brings this Cause-of-Action No. 4, for ***Battery—Unconsented Touching,*** as against all Defendants.  Plaintiff here incorporates all numbered paragraphs.

(76)   Defendants engaged in the intentional and unconsented "touching" of Plaintiff's person by selling ***Natural Vitality Calm,*** laced with tiny red particles, which ultimately came into contact with Plaintiff's person, (the "touching").  Defendants set into motion this instrumentality—*i.e.*, the tiny red particles—with the intent that some unlucky customers would unwittingly ingest the same.

(77)   Plaintiff did not consent to the "touchings" that occurred when the tiny red particles—which were lurking in the magnesium powder—came into contact with his person.  This was an "unconsented touching."  Plaintiff did not consent to consuming magnesium powder laced with suspicious-looking, tiny red particles of unknown origin.

(78)   Plaintff is harmed and offended by Defendants' unconsented "touchings."  Reasonable persons of ordinary prudence would be harmed and offended upon learning they had unwittingly ingested suspicious-looking, tiny red particles of unknown origin.

(79)   As a direct result of Defendants' unconsented "touchings," Plaintiff sustains injuries.  Defendants' actions were a substantial factor in causing Plaintiff's harm, along with attendant pain and suffering.  Plaintiff seeks monetary damages in an amount T.B.D. at trial.

(80)   Plaintiff seeks preliminary and permanent injunctions:  (a) a court order requiring Defendants to identify the nature and purpose of the red particles, as well as their ingredients; (b) a court order prohibiting Defendants from selling products tainted with the red particles; (c) a court order recalling tainted lot numbers; (d) a court order requiring Defendants to identify the product manufacturer; and (e) a court order requiring Defendants to identify the red particle manufacturer.

(81)    Plaintiff seeks "punitive damages" for fraud.  Plaintiff seeks a dollar amount sufficient to deter future misconduct.  Defendants demonstrate fraud because they act with intent to deceive others—(i) Defendants fail to disclose "all" ingredients in the product, (ii) Defendants fail to disclose the presence of red particulate matter in the product, (iii) Defendants fail to disclose the ingredients in the red particulate matter, (iv) Defendants fail to disclose the product manufacturer's identity, and (v) Defendants fail to disclose the red particle manufacturer's identity.

(82)    Plaintiff seeks an award of litigation expenses, courts costs and reasonable attorney's fees—for enforcing important rights affecting the public interest.

////

////

////

ɔʒ  CAUSE of ACTION No. 5  ɕ

(83)  INFLICTION OF EMOTIONAL DISTRESS:  This Cause-of-Action No. 5, for "***Infliction of Emotional Distress,***" (negligent and intentional), is brought by Plaintiff as against all Defendants.  Plaintiff here incorporate all numbered paragraphs.

(84)  By "actively" lacing the magnesium powder with red particles, Defendants caused Plaintiff to suffer mental anguish, (*i.e.*, intentinal infliction); *or in the alternative*, by "passively" allowing others to lace it, Defendants caused Plaintiff to suffer mental anguish, (*i.e.*, negligent infliction).  In a light most favorable, Defendants are negligent; in the worst light, Defendants are willfully lawless.  But in both instances, the product is inherently defective because it comes with suspicious-looking, red particulate matter that should *not* be there.  In both instances, Defendants' conduct is extreme and outrageous.

(85)  Defendants are blameworthy for intentional and accidental contaminants in products they sell.  Defendants must be held responsible when unlucky customers unwittingly ingest their contaminated products—regardless of whether the contaminants are there "on purpose" or "by accident."

(86)  Reasonable persons of ordinary prudence would experience severe mental anguish—when they suddenly learn that they unwittingly ingested mysterious, red particulate matter of unknown origin.

(87)  Plaintiff is now apprehensive of cancer.  For approx. ten (10) straight weeks, Plaintiff ingested powder from a tub tained with mysterious, red particulate matter of unknown origin.  Plaintiff now suffers from persistent (but not unreasonable) fear that he may develop cancer—caused by the red particulate matter.

(88)  As a direct result of Defendants' negligent and/or intentional infliction of emotional distress, Plaintiff sustains injuries.  Defendants' actions were a substantial factor in causing Plaintiff's harm, along with attendant pain and suffering.  Plaintiff seeks monetary damages in an amount T.B.D. at trial.

(89)   Plaintiff seeks preliminary and permanent injunctions:  (a) a court order requiring Defendants to identify the nature and purpose of the red particles, as well as their ingredients; (b) a court order prohibiting Defendants from selling products tainted with the red particles; (c) a court order recalling tainted lot numbers; (d) a court order requiring Defendants to identify the product manufacturer; and (e) a court order requiring Defendants to identify the red particle manufacturer.

(90)   Plaintiff seeks "punitive damages" for fraud.  Plaintiff seeks a dollar amount sufficient to deter future misconduct.  Defendants demonstrate fraud because they act with intent to deceive others—(i) Defendants fail to disclose "all" ingredients in the product, (ii) Defendants fail to disclose the presence of red particulate matter in the product, (iii) Defendants fail to disclose the ingredients in the red particulate matter, (iv) Defendants fail to disclose the product manufacturer's identity, and (v) Defendants fail to disclose the red particle manufacturer's identity.

(91)   Plaintiff seeks an award of litigation expenses, courts costs and reasonable attorney's fees—for enforcing important rights affecting the public interest.

/ / / /

/ / / /

/ / / /

ᑫ  <u>PRAYER *for* RELIEF</u>  ᔕ

(92)   WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, in the following manner:

> (i)     for an award of judgment on all causes of action;
>
> (ii)    for general and special damages in accordance with proof;
>
> (iii)   for punitive and exemplary damages;
>
> (iv)    a court order requiring Defendants to identify the nature and purpose of the red particles (along with a chemical breakdown);
>
> (v)     for temporary and permanent injunctions forbidding Defendants from selling products tainted with the red particles;
>
> (vi)    for a court order recalling tainted lot numbers;
>
> (vii)   for a court order requiring Defendants to identify the product manufacturer and the red particle manufacturer;
>
> (viii)  a judicial declaration that all Nevadans have a fundamental right to know what's in the food they eat;
>
> (ix)    for costs and expenses of this lawsuit;
>
> (x)     for reasonable attorney's fees for enforcing important rights affecting the public interest;

And such other and further relief as the Court deems just and proper.

Dated:  **Jan. 17, 2020**          LAW OFFICES OF T. MATTHEW PHILLIPS

*T. Matthew Phillips*

T. Matthew Phillips, Esq.
*In Propia Persona*

1

&#8731; PLAINTIFF'S VERIFICATION &#8734;

My name is T. MATTHEW PHILLIPS and I am the Plaintiff in this lawsuit. I hearby verify that the allegations herein are true and correct of my own personal knowledge; and as to those matters alleged on information and belief, I reasonably believe such allegations to be true.  If called upon to testify, I could and would give competent and truthful evidence.

Attached hereto are three photos, which I took, depicting the Natural Calm Product, as well as the tiny red particles in a drinking glass.

I hereby declare under penalty of perjury, pursuant to the laws of the State of Nevada, the foregoing is both true and correct.

Dated: **Jan. 17, 2020**                     LAW OFFICES OF T. MATTHEW PHILLIPS

_T. Matthew Phillips_

T. Matthew Phillips, Esq.
*Plaintiff's Counsel.*

- PHOTOGRAPHS -





